IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL AITKIN,                                        No. 2:21-cv-00267-HZ

                Plaintiff,                        OPINION & ORDER

     v.

USI INSURANCE SERVICES, LLC,
a foreign limited liability company,

                Defendant.

HERNÁNDEZ, District Judge:

Defendant USI Insurance Services, LLC, seeks to enjoin Plaintiff Michael Aitkin, its former broker, from working for one of its competitors and competing against Defendant or soliciting Defendant's customers in violation of the terms of his employment agreement. The Court held oral argument on February 24, 2021. For the following reasons, Defendant's Motion for a Temporary Restraining Order is granted in part.

## BACKGROUND

Defendant is a large insurance brokerage firm. Plaintiff started working as an insurance broker for Defendant in May 2018, serving primarily agricultural clients in Oregon and Washington. Aitken Decl. ¶ 10, ECF 16. Shortly before he started, Plaintiff entered into an Employment Agreement with Defendant. Brisbee Decl., Ex. A ("Agreement"), ECF 4-1.

Relevant here, the Agreement includes several restrictive covenants. Specifically, Section 9.2[1] of the Agreement provides:

> ***Termination by Producer.*** Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

Agreement § 9.2.

Sections 2.3 and 2.4 of the Agreement provide:

> 2.3 ***No Conflicts of Interest.*** During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company, unless disclosed to and agreed to by the Regional CEO and Chief Compliance Officer in writing. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

---

[1] At oral argument, counsel for Defendant referred to Section 9.2 as a "garden leave" provision. "Under garden leave clauses, the employee promises to provide the employer with a relatively long period of notice (usually three to twelve months) before terminating the employment and moving on to a competitor. In exchange, the employer agrees to pay the employee's full salary and benefits during this period without requiring the employee to come to work. . . . The essential difference between garden leave clauses and the more traditional, post-employment restrictive covenants is not only that the employee is paid during the notice period, but also that he remains an 'employee' of his former employer." Greg T. Lembrech, *Garden Leave: A Possible Solution to the Uncertain Enforceability of Restrictive Employment Covenants*, 102 COLUM. L. REV. 2291, 2305 (2002).

2.4 ***Duty of Loyalty and Good Faith.*** Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of the Company and any other USI Company.

Agreement §§ 2.3 and 2.4.

Sections 8.5 and 8.6 provide:

8.5 ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

> (a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

> (b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

8.6 ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.*** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

> (a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

> (b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Produce solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

Agreement §§ 8.5 and 8.6.

On February 4, 2021, Plaintiff emailed Defendant notice of his resignation "effective immediately," and informed Defendant that he believed the post-termination restrictions in the Agreement were void and unenforceable. Brisbee Decl., Ex. B, ECF 4-2; Aitken Decl. ¶ 11. That same day, Defendant sent Plaintiff a letter informing him that, under the Agreement, he was required to provide Defendant with 60-days' notice of his resignation and, therefore, his resignation would not become effective until April 4, 2021. Brisbee Decl., Ex. C, ECF 4-3.

On February 5, 2021, Plaintiff filed a declaratory judgment action in state court seeking to invalidate the Agreement's restrictive covenants. Brisbee Decl., Ex. D, ECF 4-4. Plaintiff also

updated his LinkedIn profile advertising himself as an employee of Defendant's competitor, Alliant. Brisbee Decl., Ex. F, ECF 4-6.

Since Plaintiff announced his resignation, three of Defendant's clients that had accounts managed by Plaintiff have contacted Defendant about moving their business to Alliant. Brisbee Decl., Ex. G, ECF 4-7. Defendant "has already lost at least two client accounts [Plaintiff] manages, at a cost of approximately $170,000." Def. Mot. 10, ECF 3; *see also* Brisbee Decl. ¶ 27, ECF 4. Plaintiff declares that, although some of his previous clients have independently contacted him, he "did not solicit them or otherwise seek to encourage or induce them to leave [Defendant]." Aitken Decl. ¶ 22. Instead, he "told them [he] could not talk about [his] new position and provided them with an Alliant phone number to call." *Id.* Plaintiff "ha[s] not accepted any business from [Defendant's] client[s] or prospective client[s] or serviced their accounts." *Id.*

On February 18, 2021, Defendant removed the underlying declaratory judgment action to this Court. Notice of Removal, ECF 1. The following day, Defendant filed its Answer and a counterclaim for breach of the Agreement's restrictive covenants. Answer, ECF 2.

## STANDARDS

The standard for a temporary restraining order ("TRO") is "essentially identical" to the standard for a preliminary injunction. *Chandler v. Williams*, No. CV 08-962-ST, 2010 WL 3394675, at *1 (D. Or. Aug. 26, 2010) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)); *see also Daritech, Inc. v. Ward*, No. CV-11-570-BR, 2011 WL 2150137, at * 1 (D. Or. May 26, 2011) (applying preliminary injunction standard to motion for TRO). "A [movant] seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 21 (2008)). "The elements of [this] test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to [the movant] might offset a lesser showing of likelihood of success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Similarly, serious questions going to the merits, coupled with a balance of equities that tips sharply in a movant's favor, will support the issuance of an injunction if the other elements of the test are met. *Id.* at 1134–35 (internal citations omitted).

## DISCUSSION

Defendant moves for a temporary restraining order on its breach of contract claim. Def. Mot., ECF 3. Because Defendant is likely to succeed on the merits of its claim and will likely suffer some irreparable harm in the absence of a TRO, the Court grants Defendant's Motion in part.

## I.     Likelihood of Success on the Merits

To establish a breach of contract claim under Oregon law, a claimant must show: (1) the existence of a contract; (2) its relevant terms; (3) the claimant's full performance and lack of breach; and (4) the defendant's breach resulting in damage to the claimant. *Schmelzer v. Wells Fargo Home Mortg.*, No. CV-10-1445-HZ, 2011 WL 5873058, at *4 (D. Or. Nov. 21, 2011) (citing *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570-71, 927 P.2d 1098, 1101 (1996)).

Under Section 9.2 of the Agreement, Plaintiff was required to give 60 days' notice before terminating his employment with Defendant. Plaintiff's February 4, 2021 email to Defendant

announcing his immediate resignation violated the 60-day notice requirement. The "garden leave" provision provides that the earliest Plaintiff could terminate his employment is April 4, 2021. Until then, Plaintiff is still considered Defendant's employee and is bound by the No Conflicts of Interest and Duty of Loyalty requirements contained in Sections 2.3 and 2.4 of the Agreement. Plaintiff is likely violating those contractual duties by working for Defendant's competitor, Alliant, and by providing his former clients "with an Alliant phone number to call" when they contacted him about his new position. Aitken Decl. ¶ 22. The Court therefore finds Defendant has shown it is likely to succeed on the merits as to this aspect of its breach of contract claim.[2]

## II.    Irreparable Harm

"[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *L.A. Memorial Colliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). However, harm to a company's goodwill, reputation, loss of client relationships, and financial damage can constitute "irreparable harm." *See Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.")

Defendant argues that it will suffer irreparable harm in the absence of a TRO because Plaintiff "is already starting to steal [Defendant]'s clients and if history with Alliant is any

---

[2] Plaintiff's breach of the "garden leave" provisions is dispositive for purposes of resolving Defendant's request for a TRO. The Court therefore declines to reach Defendant's argument that it is likely to succeed on the merits of its claim that Plaintiff also breached the Agreement's Non-Solicitation and Non-Acceptance clauses. *See* Agreement §§ 8.5 and 8.6.

indication, such client departures will increase exponentially the longer [Plaintiff] and Alliant are able to pluck off [Defendant]'s clients freely." Def. Mot. 17. Defendant asserts that not only will it lose the commissions generated by the lost accounts, but it will also lose the opportunity for continued and expanded business opportunities created by those client relationships. Defendant claims that without injunctive relief it has little chance of convincing the departing clients to come back, especially when it does not know the extent to which Plaintiff has spread negative information about Defendant in his efforts to convince the clients to transfer their business. Finally, Defendant argues that the quick and continuous departure of Plaintiff's former accounts will tarnish its reputation and deplete the goodwill it has worked to build.

Plaintiff declares that he is neither soliciting nor accepting Defendant's customers, and there is no evidence to the contrary. Aitken Decl. ¶ 22. Nor is there any evidence that Plaintiff is tarnishing Defendant's reputation by spreading false or negative information about it. The evidence does indicate, however, that Plaintiff currently working for Alliant—which he publicly advertised through LinkedIn—and his referral of former clients to Alliant when they contacted him are causing Defendant to lose client relationships. Brisbee Decl., Ex. F, ECF 4-6; Aitken Decl. ¶ 22; *see also Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (noting "customers are likely to follow [their previous broker] because of their unique relationship"). Thus, in the absence of a TRO, Defendant will likely suffer some irreparable harm due to Plaintiff's violations of the No Conflicts of Interest and Duty of Loyalty provisions. *See*, *e.g.*, *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1228 (D. Or. 2016) (granting a temporary restraining order where the movant would "likely suffer some irreparable harm in the form of loss of client relationships and accompanying financial damage"

even though there was no evidence that it would "likely suffer harm to its goodwill or reputation in the absence of temporary injunctive relief").

## III.     Balance of the Equities

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted). Defendant's likelihood of success on the merits and irreparable harm tips the balance of the equities in its favor as to demand that Plaintiff comply with the Agreement's "garden leave" provisions. *See Brinton Bus. Ventures, Inc. v. Searle* ("*Brinton*"), 248 F. Supp. 3d 1029, 1039 (D. Or. 2017) (citing *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, 648 F. App'x 709, 711 (9th Cir. 2016)). Although the proposed restraining order imposes a burden on Plaintiff in the form of temporarily prohibiting him from working for Alliant, that burden is minimal given that Defendant will continue to pay Plaintiff until his employment ends on April 4, 2021. *See Nike, Inc. v. McCarthy*, 379 F.3d 576, 587 (9th Cir. 2004) (finding balance of equities tipped in the employer's favor where it continued to pay the employee during the restriction period); Brisbee Decl. ¶ 30 (Defendant "has committed to paying [Plaintiff] through the remainder of the 60-day notice period and intends to do so up to and including April 4, 2021."). Defendant's "need to protect its legitimate business interests substantially outweighs the virtually non-existent concern that [Plaintiff] could lose his livelihood." *Natsource LLC*, 151 F. Supp. 2d at 472.

## IV.     Public Interest

Plaintiff argues granting injunctive relief will harm the public interest by depriving Defendant's clients "the freedom to do business with their long-term insurance broker who knows their business, risks, and claims and loss history." Pl. Resp. 27, ECF 14. Plaintiff argues

this is especially important because Defendant's clients need to "obtain the best insurance advice" during "these extraordinary and changing circumstances due to the Covid-19 pandemic." *Id.* at 27-28. The Court disagrees.

Contrary to Plaintiff's assertion that a TRO will force Plaintiff's former clients to keep their business with Defendant even if they do not want to, the clients are free to take their insurance needs to any brokerage firm of their choosing. And given Plaintiff's claim that he is neither soliciting nor servicing Defendant's former clients that have already transferred their business to Alliant, those clients are not getting the benefit of Plaintiff's expertise anyway. Therefore, a TRO—which only lasts for a short duration—will not deprive the clients of anything they are not already doing without.

In a similar case involving a non-solicitation and noncompete agreement, this Court noted that "Oregon law reflects a balancing of competing policies: 'The freedom to pursue one's chosen occupation is in tension with freedom of contract, and the advocate of competition must grapple with the argument that noncompete agreements are economically advantageous because they protect costly investments.'" *Brinton*, 248 F. Supp. 3d at 1039 (D. Or. 2017) (quoting *Ocean Beauty Seafoods*, 648 F. App'x at 711-12). This case reflects that tension and, as in *Brinton*, the Court concludes that the public interest does not strongly favor either side.

## V.    Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court has broad discretion as to the amount of a security bond. *Jorgensen v. Cassidy*, 320 F.3d 906, 919 (9th Cir. 2003). Given that Defendant

will be paying Plaintiff his salary during the duration of the TRO, the Court finds, at this juncture, that a bond is unnecessary.

## TEMPORARY RESTRAINING ORDER

IT IS ORDERED that Defendant's Motion for Temporary Restraining Order is GRANTED in part as follows:

(1)  Until the Court orders otherwise and except as otherwise expressly permitted by this Temporary Restraining Order, for the next 14 days,[3] or until such time as the parties agree in writing to terminate, amend, or supersede this TRO, Plaintiff is enjoined from providing any services to Alliant or any other competitor of Defendant (as an employee, producer, contractor, advisor, sales agent, or consultant).

(2) Plaintiff, and/or those acting in concert with him, are enjoined from publicizing employment with Alliant or any other competitor of Defendant.

(3) The parties may engage in expedited discovery, within the scope of Federal Rule of Civil Procedure 26, in a timeframe that allows for the exchange of documents, responses to discovery requests, and the taking of depositions at least three (3) days before the preliminary injunction hearing.

(4) The parties shall meet and confer and propose a preliminary injunction hearing date and briefing schedule no later than March 1, 2021.

///

///

///

---

[3] Under Federal Rule of Civil Procedure 65(b)(2), the Court may extend the TRO by an additional 14 days upon a showing of "good cause."

## CONCLUSION

Defendant's Motion for a Temporary Restraining Order [3] is GRANTED in part as set forth in this Opinion & Order.

IT IS SO ORDERED.


DATED: _____February 26, 2021_____.



MARCO A. HERNÁNDEZ
United States District Judge

February 26, 2021