IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL AITKIN,

        Plaintiff,

v.

USI INSURANCE SERVICES, LLC,
a foreign limited liability company,
KIBBLE & PRENTICE HOLDING
COMPANY, a foreign corporation doing
business as USI INSURANCE SERVICES
NORTHWEST

        Defendants.

No. 2:21-cv-00267-HZ

OPINION & ORDER

HERNÁNDEZ, District Judge:

    Defendants USI Insurance Services, LLC ("USI"), and Kibble & Prentice Holding Company, seek to enjoin their former employee, Plaintiff Michael Aitkin, from competing against Defendants or soliciting Defendants' customers in violation of the terms of his

employment agreement. For the following reasons, Defendants' Motion for a Preliminary Injunction is granted in part.

## BACKGROUND

USI is a large insurance brokerage firm. Plaintiff began working as a producer for USI in May 2018, serving primarily agricultural clients in Oregon and Washington. Aitkin Decl. ¶ 10, ECF 16. Shortly before he started, Plaintiff entered into an Employment Agreement with USI. Brisbee Decl., Ex. A ("Agreement"), ECF 4-1.

Relevant here, the Agreement's "Garden Leave" provision provides:

> 9.2 ***Termination by Producer.*** Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.
>
> 2.3 ***No Conflicts of Interest.*** During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company, unless disclosed to and agreed to by the Regional CEO and Chief Compliance Officer in writing. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.
>
> 2.4 ***Duty of Loyalty and Good Faith.*** Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of the Company and any other USI Company.

Agreement §§ 9.2, 2.3, 2.4.

The "Restrictive Covenants" provide:

> 8.5 ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

8.6 *Non-Acceptance / Non-Service of Clients and Active Prospective Clients.* In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

> (b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Produce solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

Agreement §§ 8.5, 8.6.

On February 4, 2021, Plaintiff emailed USI notice of his resignation "effective immediately," and informed USI that he believed the Agreement's post-employment restrictions were void and unenforceable. Brisbee Decl., Ex. B, ECF 4-2; Aitken Decl. ¶ 11. In response, USI sent Plaintiff a letter informing him that, under the Agreement, he was required to provide 60-days' notice of his resignation and, therefore, his resignation would not become effective until April 4, 2021. Brisbee Decl., Ex. C, ECF 4-3.

On February 5, 2021, Plaintiff filed a declaratory judgment action in state court seeking to invalidate the Agreement's restrictive covenants. Brisbee Decl., Ex. D, ECF 4-4. Plaintiff also updated his LinkedIn profile advertising himself as an employee of Defendant's competitor, Alliant. Brisbee Decl., Ex. F, ECF 4-6. On February 18, 2021, USI removed the underlying declaratory judgment action to this Court. Notice of Removal, ECF 1. The following day, USI filed a counterclaim for breach of the Agreement and moved for a Temporary Restraining Order ("TRO") and expedited discovery. Answer, ECF 2; Def. Mot. TRO, ECF 3.

After hearing oral argument on February 24, 2021, the Court granted USI's motion for a TRO as to its claim that Plaintiff breached the Garden Leave provision, deferred ruling on USI's

request for preliminary relief as to the claimed violations of the Restrictive Covenants, and gave the parties leave to engage in expedited discovery. Op. & Order, ECF 19.

On April 26, 2021, Defendants filed their Motion for a Preliminary Injunction, seeking an order: (1) enjoining Plaintiff, and those acting in concert with him, from "soliciting/diverting or accepting/servicing USI clients as specified in the Agreement"; and (2) requiring "Alliant to disgorge the USI clients that Alliant has taken." Def. Mot. Prelim. Inj. 29, ECF 56. The Court held a hearing on the matter on May 13 and May 14, 2021, at which it took testimony from witnesses, received exhibits into evidence, and heard argument from the parties. ECF 74, 75.

The relevant evidence demonstrates that the day before Plaintiff sent USI his resignation, two of his former colleagues at USI, Lee Tilleman and Vanessa Anderson, also resigned without notice to begin working for Alliant. Dates Decl., Ex. 15, at 82:10-17, ECF 54-15. Within a day of Plaintiff's resignation, USI informed its clients with accounts managed by Plaintiff that he had "abruptly" departed. Wood Decl., Ex. 4, at 68:4-9, 69:24-70:3, ECF 59-4. This spurred approximately 25 of Plaintiff's former clients—many of whom had known him for years and consider him a friend—to call him for more details. Dates Decl., Ex. 16 ("Pl.'s Resp. Interrog.") at 10-13, ECF 54-16; Dates Decl., Ex. 3 ("Aitkin Dep."), at 134:21-182:14, ECF 54-3. There is no evidence that Plaintiff initiated contact with the clients, although he returned some of the clients' missed calls or called them back in response to text messages requesting a return call. Pl.'s Resp. Interrog. 11, 13. One client, Derek Teal, testified that he contacted Plaintiff after Tilleman informed him that Plaintiff could not call Teal but he could call Plaintiff.

When Plaintiff spoke with the clients, he did not discuss business matters or their insurance policies and generally informed them that he could not solicit their business or service their accounts due to his noncompetition agreement with USI. *Id.* at 13-14. However, Plaintiff

did provide most of the clients with contact information for his new colleagues at Alliant, Bruce Droz or Trey Busch, if they wanted more information. Aitkin Dep. 134:21-182:14. Droz generally told the clients that Plaintiff would not be able to service their accounts but gave no indication for how long. Dates Decl., Ex. 17, at 70:3-10, ECF 54-17. Droz also told at least one client that bringing his business to Alliant would allow the client to keep Plaintiff as its broker. Dates Decl., Ex. 26, at 21:25-22:15, ECF 54-26. Another Alliant employee told a client that transferring its business to Alliant would allow the client to "continue to work with" Plaintiff. Dates Decl., Ex. 25, ECF 54-25. After speaking with Droz and other Alliant employees, at least seven of Plaintiff's former USI clients signed letters making Alliant their insurance broker. In total, USI has lost approximately 23 agricultural insurance clients to Alliant that were previously serviced by Plaintiff, Tilleman, or Anderson.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a

stronger showing of one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

**DISCUSSION**

Because the 60-day term of the Agreement's Garden Leave provision has now expired, Defendants seek injunctive relief only as to their claim that Plaintiff breached the Agreement's Restrictive Covenants.

**I.      Enforceability of the Restrictive Covenants**

As an initial matter, the parties disagree on whether the Restrictive Covenants should be construed as a noncompetition agreement, which must comply with common law and Oregon Revised Statute § ("O.R.S.") 653.295, or merely as restraints on solicitation and transacting business with customers, which need only comply with common law. Under O.R.S. 653.295(4)(b), "[a] covenant not to . . . solicit or transact business with customers of the employer" is exempt from the requirements of the statute.

Here, the Restrictive Covenants are "much broader" than an agreement not to merely solicit or transact business with Defendants' customers. *Naegeli Reporting Corp. v. Petersen*, No. 3:11-1138-HA, 2011 WL 11785484, at *3 (D. Or. Dec. 5, 2011). As this Court previously determined, a covenant that prohibits a former employee from "directly or indirectly" soliciting, diverting, inducing, or servicing business from current or prospective clients "should be construed as a non-competition agreement." *Id.*; *cf. Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, 648 F. App'x 709, 711 (9th Cir. 2016) (explaining "[i]t is well-established that a noncompete agreement is a reasonable means of protecting against" the risk that an

employee could use proprietary information to "*divert* all or part of the employer's business") (citing *Nike, Inc. v. McCarthy*, 379 F.3d 576, 586 (9th Cir. 2004) (emphasis added)). Indeed, O.R.S. 653.295(7)(d)'s definition of a "noncompetition agreement" is "broad." *Dymock v. Norwest Safety Protective Equip. for Oregon Indus., Inc.*, 172 Or. App. 399, 403-04, *rev'd on other grounds*, 334 Or. 55 (2002) (concluding "we find no error" in the Court of Appeals' "interpretation of the statute").

Despite Defendants' argument to the contrary, "a nonsolicitation agreement need not 'absolutely' preclude an employee from engaging in the same business as the employer in order to be deemed a noncompetition agreement, as long as it 'materially deterred or impaired the employee from doing so.'" *Moreland v. World Commc'n Ctr., Inc.*, No. CIV. 09-913-AC, 2010 WL 4237302, at *3 (D. Or. Sept. 17, 2010) (quoting *Dymock*, 172 Or. App. at 404). Because the "overall effect of [Sections 8.5 and 8.6 of] the Agreement is to prevent [Plaintiff] from competing with [Defendants]," the Court construes the Restrictive Covenants as a noncompetition agreement that must comply with both O.R.S. 653.295 and common law. *Naegeli Reporting Corp.*, 2011 WL 11785484, at * 3.

    **A.**    **O.R.S. 653.295**

Amongst other requirements not at issue here, O.R.S. 653.295 provides that a noncompetition agreement is "voidable" if an employer fails to inform "the employee in a written employment offer received by the employee at least two weeks before the first day of the employee's employment that a noncompetition agreement is required as a condition of employment." O.R.S. 653.295(1)(a)(A). The evidence demonstrates—and Plaintiff does not dispute—that USI provided him with a copy of the Agreement more than 14 days before the first

day of his employment. Accordingly, the noncompetition provisions are not voidable for lack of sufficient notice.

However, under O.R.S. 653.295(2), "[t]he term of a noncompetition agreement may not exceed 18 months from the date of the employee's termination." The Restrictive Covenants' two-year term violates the durational limitation imposed by the statute; however, "Oregon law endorses reformation if necessary to make a noncompete agreement reasonable in scope." *Ocean Beauty Seafoods*, 648 F. App'x at 710–11 (citation omitted); *see also* O.R.S. 653.295(2) ("The remainder of a term of a noncompetition agreement in excess of 18 months is voidable and may not be enforced by a court of this state."); Agreement § 8.10 (agreeing "unenforceable terms" should be "blue penciled"). Accordingly, the Agreement is enforceable only to the extent that it prohibits Plaintiff from competing with Defendants for 18 months.

### B. Common Law

Under Oregon common law, a contract in restraint of trade must be: (1) partial or restricted in its operation in respect either to time or place; (2) made on some good consideration; and (3) reasonable, in that, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public. *Nike, Inc.*, 379 F.3d at 584 (9th Cir. 2004) (citing *Eldridge v. Johnston*, 195 Or. 379, 403 (1952)). "To satisfy the reasonableness requirement, the employer must show as a predicate that it has a legitimate interest entitled to protection." *Id.* (quotations and citations omitted).

As to the first factor, the Restrictive Covenants are not overbroad as to place because they do not contain a geographical limitation. Rather, the covenants prohibit Plaintiff from competing

against Defendants with respect to "Client Accounts" and "Active Prospective Clients"[1] that Plaintiff directly dealt with, or obtained confidential information about, during his employment with USI. As discussed, however, the covenants' two-year term is overbroad in duration and may not be enforced to the extent it exceeds the 18-month statutory limitation.

The second factor is not at issue. There is no dispute that Plaintiff received "good consideration" in the form of financial compensation in exchange for agreeing to the covenants.

Regarding the third, reasonableness factor, an employee's "general knowledge, skill, or facility acquired through training or experience while working for an employer," are insufficient to support a noncompetition agreement, even if "the on-the-job training has been extensive and costly." *Nike, Inc.*, 379 F.3d at 585 (internal quotation marks and citations omitted). "Nonetheless, an employer has a protectible interest in information pertaining especially to the employer's business," including customer lists and other "specialized information relating to customers." *Id.*; *see also N. Pac. Lumber Co. v. Moore*, 275 Or. 359, 364 (1976) (An employer's protectable "interest need not be in the form of a trade secret or a secret formula; it may consist of nothing more than valuable 'customer contacts.'"); O.R.S. 653.295(1)(c)(B) (an employer has interests in "competitively sensitive confidential business or professional information[,] including product development plans, product launch plans, marketing strategy or sales plans"). An employer also has a protectable interest in the goodwill established between its employees and customers. *Kelite Prod. v. Brandt*, 206 Or. 636, 652, 294 P.2d 320, 327 (1956) (noting the "employer, who pays [its salespeople] a salary for this purpose, is entitled to the good will which

---

[1] "'Client Account' means the account of any client . . . which is or was serviced by the Company in connection with the Company's business[.]" Agreement § 1(c). "'Active Prospective Client' means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder." *Id.* at § 1(a).

10 – OPINION & ORDER

they so establish, and to be protected therein insofar as it may be reasonably necessary to [its] interests").

Here, Defendants have produced evidence and testimony demonstrating that Plaintiff possessed considerable and specialized information concerning USI's business and, in particular, its relationships with its customers. And based on the former clients' testimony, it is readily apparent that the clients transferred their business to Alliant due to the goodwill that Defendants paid Plaintiff to foster while working for USI. The Court therefore concludes that Defendants have established a legitimate interest sufficient to support a noncompetition agreement.

## II. Likelihood of Success on the Merits

To establish a breach of contract claim under Oregon law, a claimant must show: (1) the existence of a contract; (2) its relevant terms; (3) the claimant's full performance and lack of breach; and (4) the defendant's breach resulting in damage to the claimant. *Schmelzer v. Wells Fargo Home Mortg.*, No. CV-10-1445-HZ, 2011 WL 5873058, at *4 (D. Or. Nov. 21, 2011) (citing *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570-71, 927 P.2d 1098, 1101 (1996)).

The Restrictive Covenants provide that Plaintiff shall not, "directly or indirectly," on behalf of a competitor "in any capacity:" (1) "solicit or attempt to solicit," (2) "divert or attempt to divert," or (3) "sell, provide, or accept any request to provide services in competition" with Defendants as to Defendants' active or prospective clients. Agreement §§ 8.5, 8.6. Additionally, Plaintiff may not "induce the termination, cancellation or non-renewal" of Defendants' active clients. *Id.* at § 8.5(a). The foregoing restrictions apply only to Defendants' active clients that Plaintiff personally serviced or obtained confidential information about within two years prior to his last day of employment, and only to those prospective clients that he personally solicited or

11 – OPINION & ORDER

obtained confidential information about within six months prior to the end of his employment. *Id.* at §§ 8.5, 8.6.

The record and testimony indicate that Plaintiff likely diverted and indirectly induced Defendants' clients to transfer their business to Alliant in violation of the Restrictive Covenants. The Court also finds that Plaintiff referring the clients to Droz or Busch likely constituted indirect acceptance of the clients' request for competitive services. Whether Defendants' claims for violation of the Restrictive Covenants will ultimately be borne out by more complete discovery and proved to the trier of fact remains to be seen, but the Court concludes that Defendants have met their burdens of proof and persuasion concerning the alleged breach of the covenants.

## III. Irreparable Harm

The Ninth Circuit has held that "[a]n enforceable noncompete agreement affords fair protection to a legitimate interest of the former employer," and a breach of the agreement causes harm to the former employer. *Ocean Beauty Seafoods*, 648 F. App'x at 711. "Because this harm is intangible and difficult to quantify, it qualifies as irreparable." *Id.* (citing *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). The threatened harm cannot, however, be speculative. *Id.*

Defendants have produced evidence that it has suffered the loss of longstanding client relationships because of Plaintiff's post-employment conduct. Defendants have also produced evidence that it is threatened with further loss of customer relationships, goodwill, and reputational harm in the absence of injunctive relief. This is sufficient to establish irreparable harm in the preliminary injunction context. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

Plaintiff's damages expert, George Strong, testified that goodwill and reputation are quantifiable. Mr. Strong did not, however, address the calculability of the harm created by the situation where, as here, there is a significant loss of clients in a short period of time. Mr. Strong also failed to address the long term and unquantifiable damage to Defendants' business, such as the costs associated with rebuilding and creating new relationships in the agricultural insurance industry, loss of market share, and changes to Defendants' business plan. The Court therefore finds that Defendants will likely suffer irreparable harm in the absence of preliminary relief.

## IV. Balance of the Equities

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted). Here, an injunction will impose a burden on Plaintiff but will not bar him from working in the agricultural insurance industry, so long as he refrains from diverting or inducing Defendants' active and prospective clients. Furthermore, Plaintiff's substantial annual salary at Alliant is not contingent on him bringing any clients over to Alliant and is guaranteed for the entirety of the statutorily permissible 18-month term of the noncompetition agreement. Whereas, absent injunctive relief, Defendants will likely continue to suffer the loss of valuable client relationships, goodwill, and reputation. As such, Defendants' "need to protect [their] legitimate business interests substantially outweighs the virtually non-existent concern that [Plaintiff] could lose his livelihood." *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001). The Court

therefore concludes that the balance of the equities favors the injunction on the terms set forth below.

V.  **Public Interest**

In cases involving restraints on trade, Oregon law reflects a balance between the competing public policies: "The freedom to pursue one's chosen occupation is in tension with freedom of contract, and the advocate of competition must grapple with the argument that noncompete agreements are economically advantageous because they protect costly investments." *Ocean Beauty Seafoods*, 648 F. App'x at 711-12. Because the Restrictive Covenants, as construed by the Court, comport with Oregon law, "an injunction enforcing it is not antithetical to any public interest." *Id*. Contrary to Plaintiff's arguments, the Court finds that the interests of a handful of clients who desire Plaintiff service their agricultural insurance needs does not change the analysis. Accordingly, the public interest does not weigh strongly in favor of either side.

VI. **Scope of the Injunction**

Defendants' request for injunctive relief is overbroad to the extent it asks this Court to order Alliant to "disgorge the USI clients that Alliant has taken as a result" of Plaintiff's post-employment conduct. Def. Mot. Prelim. Inj. 29. Generally, "[c]ourts do not enjoin conduct already committed." *Garratt-Callahan Co. v. Yost*, 242 Or. 401, 402 (1966) (citing *Wiegand v. West*, 1914, 73 Or. 249, 255 (1914). An injunction that would prevent Alliant—who is not a party to this case—from servicing the clients who have chosen to follow Plaintiff would be unjust to the clients. While some of those clients will likely be surprised to learn that Plaintiff will not be handling their insurance-related needs for 18 months, that issue is between the clients and Alliant. In addition, "[a]n injunction will not serve to retrieve these lost clients, and the court

cannot compel these clients to return to" Defendants. *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*, 8 Misc. 3d 412, 422 (Sup. Ct. 2005). Accordingly, Defendants' Motion is DENIED to the extent it seeks an injunction ordering Alliant to fire USI's former clients.

## VII. Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court has broad discretion as to the amount of a security bond. *Jorgensen v. Cassidy*, 320 F.3d 906, 919 (9th Cir. 2003). Here, a bond is not required to protect Plaintiff because: (1) he will receive his annual salary regardless of whether he brings any business to Alliant; (2) to the extent his income is commission based, he is free to solicit and service entities not covered by the Agreement; and (3) he contractually waived "any requirement for [USI] to post a bond." Agreement § 10. Accordingly, the Court will not require Defendants to post security.

## PRELIMINARY INJUNCTION

IT IS ORDERED that Defendant's Motion for Preliminary Injunction is GRANTED in part as follows:

(1) Plaintiff Michael Aitkin and those in active concert with Plaintiff are hereby RESTRAINED AND ENJOINED for a period not to exceed eighteen (18) months from the date of this Order[2] from, directly or indirectly, on behalf of Alliant or any other competitor of

---

[2] The period of the injunction will run from the date of this Order to provide Defendants with the full benefit of the Restrictive Covenants. *See Ocean Beauty Seafoods*, 648 F. App'x at 712 (a court may, in equity, toll the period of a non-competition agreement to ensure that the former employer is not deprived of the benefit of the contract).

15 – OPINION & ORDER

Defendants: (a) soliciting or attempting to solicit services in competition with Defendants to any client; (b) diverting or attempting to divert services away from Defendants with respect to any client; (c) consulting for any client with respect to services in competition with Defendants; (d) signing or accepting a broker of record letter with any client to provide services in competition with Defendants; (e) inducing the termination, cancellation or non-renewal of any client's account with Defendants; or (f) selling, providing, or accepting any client's request to provide services in competition with Defendants.

(2) Plaintiff Michael Aitkin and those in active concert with Plaintiff are further RESTRAINED AND ENJOINED for a period not to exceed six (6) months from the date of this Order from, directly or indirectly, on behalf of Alliant or any other competitor of Defendants: (a) soliciting or attempting to solicit services in competition with Defendants to any prospective client; (b) diverting or attempting to divert services away from Defendants with respect to any prospective client; (c) consulting for any prospective client with respect to services in competition with Defendants; (d) signing or accepting a broker of record letter with any prospective client to provide services in competition with Defendants; or (e) selling, providing, or accepting any prospective client's request to provide services in competition with Defendants.

(3) This Order does not prevent Alliant from soliciting or servicing any clients or prospective clients so long as Alliant does not use Plaintiff in the process of doing so.

(4) For purposes of this Order:

(a) "Client" means any "Client Account," as defined in Section 1(c) of the Agreement, that Plaintiff managed, regularly serviced, or about which Plaintiff obtained "Confidential Information," as defined in Section 1(g) of the Agreement, on behalf of Defendants within the last two (2) years of Plaintiff's employment with Defendants.

(b) "Prospective client" means any "Active Prospective Client," as defined in Section 1(a) of the Agreement, that Plaintiff solicited or about which Plaintiff obtained "Confidential Information," as defined in Section 1(g) of the Agreement, on behalf of Defendants within the last six (6) months of Plaintiff's employment with Defendants.

## CONCLUSION

Defendant's Motion for a Preliminary Injunction [56] is GRANTED in part and DENIED in part as set forth in this Opinion & Order.

IT IS SO ORDERED.

DATED:\_\_\_May 28, 2021_____.

_____
MARCO A. HERNÁNDEZ
United States District Judge