IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL AITKIN,                                    No. 2:21-cv-00267-HZ

        Plaintiff,                              OPINION & ORDER

    v.

USI INSURANCE SERVICES, LLC,
a foreign limited liability company,
KIBBLE & PRENTICE HOLDING
COMPANY, a foreign corporation doing
business as USI INSURANCE SERVICES
NORTHWEST

        Defendants/Counter-Claimants,

    v.

ALLIANT INSURANCE SERVICES INC.,

        Counter-Defendant.

Debra L. Fischer
Seth Gerber
Adam Wagmeister
Morgan, Lewis & Bockius LP
2049 Century Park East, Suite 700
Los Angeles, CA 90067

1 – OPINION & ORDER

William S.T. Wood
Sussman Shank, LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205

     Attorneys for Plaintiff/Counter-Defendant

Lindsey D. G. Dates
Mariah A. Whitner
Denise Vaughn
Barnes & Thornburg LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606

Naomi Levelle Haslitt
Iván Resendiz Gutierrez
Miller Nash LLP
111 SW Fifth Avenue
Portland, OR 97204

     Attorneys for Defendant/Counter-Claimant

HERNÁNDEZ, District Judge:

Plaintiff Michael Aitkin, a former employee of Defendants USI Insurance Services, LLC and its subsidiary Kibble & Prentice Holding Company, d/b/a USI Insurance Services Northwest (collectively "USI"), brought this action seeking a declaratory judgment that the restrictive covenants in his employment contract with Defendants are void and unenforceable. The Court previously granted Defendants' motion for a preliminary injunction, which enjoined Plaintiff from competing with Defendants by servicing any of his former clients on behalf of his new employer, Counterclaim Defendant Alliant Insurance Services, Inc. ("Alliant"). *See Aitkin v. USI Ins. Servs., LLC*, No. 2:21-cv-00267-HZ, 2021 WL 2179254 (D. Or. May 28, 2021), *aff'd*, No. 21-35497, 2022 WL 1439128 (9th Cir. May 6, 2022). Defendants then filed counterclaims against Plaintiff and Alliant for, *inter alia*, breach of contract and breach of fiduciary duties.

Now before the Court are the parties' cross-motions for partial summary judgment. ECF 117, 123. The Court grants in part and denies in part Defendants' Motion for Partial Summary Judgment. The Court also grants in part and denies in part Plaintiff's and Alliant's Motion for Partial Summary Judgment.

## BACKGROUND

USI and Alliant are competitors in the commercial agriculture insurance brokerage industry. Insurance brokerage firms rely on client relationships and goodwill generated and nurtured by agents, also known as "producers," to attract and retain clients.

In 2007, Plaintiff began working as a producer for CHS Insurance Services. Over the years, he provided brokerage services for and developed relationships with many clients in the Northwest. In 2018, USI acquired the assets of CHS's agriculture insurance business. At that time, USI entered into individual employment contracts with former CHS producers, including Plaintiff. Plaintiff received a copy of an Employment Agreement during a meeting with USI representative Clark Johnson on April 10, 2018. Wood Decl. Counterdef. Mot. Ex. 10, 139:17-140:21, 151:7-23, ECF 118-10; Dates Decl. Def. Mot. Ex. 8, 146:19-22, ECF 122-8. On April 19, 2018, Johnson emailed Plaintiff a copy of an Employment Agreement for him to sign, and Plaintiff returned the signed copy on April 24, 2018. Dates Decl. Def. Mot. Ex. 3 ("Aitkin Decl.") ¶¶ 8-9, ECF 122-3. Plaintiff started work as a USI employee, subject to the Employment Agreement, on May 4, 2018. Dates Decl. Def. Mot. Ex. 14, ECF 122-14. The Employment Agreement contains the Restrictive Covenants at issue in this case. Dates Decl. Resp. Counterdef. Mot. Ex. 10 ("Agreement"), ECF 128-10.

Relevant here, terms of the Employment Agreement include "Fiduciary Duties" provisions:

2.3 ***No Conflicts of Interest***. During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company, unless disclosed to and agreed to by the Regional CEO and Chief Compliance Officer in writing. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4 ***Duty of Loyalty***. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of the Company and any other USI Company.

Agreement §§ 2.3, 2.4.

The Employment Agreement also contains "Termination" provisions, which as

relevant here provide:

9.2 ***Termination by Producer***. Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

9.4 ***Miscellaneous Termination Provisions***. Upon termination of a Producer's employment hereunder, Producer hereby irrevocably promises to:

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

Agreement § 9.2.

The "Restrictive Covenants" non-solicitation and non-service provisions provide:

8.5 ***Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

8.6 ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.*** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

> (b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

Agreement §§ 8.5, 8.6.

In August 2019, Plaintiff began having discussions with a recruiting firm about possible employment with Alliant. Wood Decl. Counterdef. Mot. Ex. 3 ("Aitkin Dep.") 21:17-22:6, ECF 118-3. On August 28, Plaintiff received a draft employment agreement from Alliant, and over the next few months, had several, ongoing discussions about working for Alliant. Aitkin Dep. 58:19-22.

On the morning of February 4, 2021, Plaintiff emailed Chris Brisbee, USI's regional president for the Northwest Region, and tendered his resignation "effective immediately." Dates Decl. Def. Mot. Ex. 13, ECF 124-1. On the day he resigned, Plaintiff updated his LinkedIn profile to show that he was an Alliant employee. Aitkin Decl. ¶ 19; Dates Decl. Resp. Counterdef. Mot. Ex. 18, ECF 128-18. Two other USI Producers, Lee Tilleman and Vanessa Anderson, had resigned abruptly on February 3, 2021, and also immediately began working for Alliant. Dates Decl. Def. Mot. Ex. 15 ("5.14.21 Hrg. Tr.) 8:1-10, ECF 122-15. Plaintiff testified that he did not discuss his plan to resign with Tilleman or Anderson and did not know that either of them had resigned when he tendered his resignation. Aitkin Dep. 93:9-96:3.

In his resignation email, Plaintiff informed USI that "I believe the post-termination restrictions in my employment agreement are a non-compete and are void and unenforceable." Dates Decl. Def. Mot. Ex. 13. USI responded to Plaintiff with a letter notifying him that he must comply with all of the obligations under the terms of his Employment Agreement, including the 60-day notice requirement to terminate his employment. Dates Decl. Resp. Counterdef. Mot. Ex. 15, ECF 128-15. The letter stated that "your resignation will become effective as of the close of business on April 4, 2021." *Id.* On February 5, 2021, Plaintiff filed suit seeking a declaration that the Restrictive Covenants in his Employment Agreement with USI "constitute an unenforceable restriction on competition." Compl. ¶ 14, ECF 1-1. Through a follow-up email from his attorney, Plaintiff stated that he would not accept salary payment beyond his stated resignation date and that he would be willing to "assist USI with respect to issues that come up concerning clients he worked with at USI." Wood Decl. Ex. 16, ECF 118-16.

Also in his resignation email, Plaintiff offered to return all property in his possession that belonged to USI. Dates Decl. Def. Mot. Ex. 13. Previously, on September 29, 2020, Plaintiff had sent an email from his USI account to this personal email account with an attached spreadsheet that contained information about all of his clients and their insurance policies. Dates Decl. Resp. Counterdef. Mot. Ex. 1, 2, ECF 128-1, 2. The spreadsheet included the policy numbers for every insurance policy associated with each client and the renewal/effective date of each policy, the specific types of coverage each client had, and the amounts paid for such coverage. *Id.* USI retrieved Plaintiff's company computer, equipment, and all paper files in his possession on March 16, 2021. Wood Decl. Counter Def. Mot. Ex. 9 ("Armstrong Dep.") 141:2-5, ECF 118-9.

Plaintiff did not directly notify any of his USI clients that he had resigned. Aitkin Decl. ¶ 19. But after he resigned, USI contacted "roughly 50 clients within 48 hours" of his resignation and notified them that Plaintiff had "abruptly" departed from USI. Wood Decl. Resp. Def. Mot. Ex. 6 ("Brisbee Dep.") 65:7-17; 69:24-70:3, ECF 126-6. Within one day of resigning, Plaintiff began receiving calls from several of his former USI clients seeking information. Dates Decl. Def. Mot. Ex. 16 at 10-13, ECF 122-16. Plaintiff did not initiate any communications with his former USI clients. Wood Decl. Counterdef. Mot. Ex. 2 ("5.14.21 Hrg. Tr.") 179:1-2, ECF 118-2.[1] One client testified that he received a call from Tilleman, who had already left USI and was working for Alliant. Dates Decl. Resp. Counterdef. Mot. ("Teal Dep.") 11:5-7, ECF 128-11. Tilleman told that client that he could call Plaintiff if wanted to speak with him, but Plaintiff could not call him. *Id.*

When he fielded calls from his former clients, Plaintiff always stated that he could not discuss details of his departure or his new employment because of his non-solicitation agreement with USI. Aitkin Decl. ¶ 22. Alliant told Plaintiff that he should not solicit business from his former USI clients who called, but he could give those clients the contact information for Bruce Droz or Trey Busch at Alliant. Dates Decl. Def. Mot. Ex. 9 ("Aitkin Dep.") 139:24-140:2, ECF 122-9. Plaintiff told his clients that if they had questions or wanted information, they could call Droz or Busch. Aitkin Dep. 144:4-181:25. For example, according to Plaintiff's deposition testimony, when he received a call from a former USI client, Kerry McCauley, CEO of Ag Supply Company of Wenatchee, the call proceeded as follows:

---

[1] At the preliminary injunction hearing, Plaintiff testified that he did not call any of his clients to tell them he had changed jobs. "If they called me and—I would return their call, but, no, I didn't reach out to anybody or initiate any phone calls, texts, anything to anybody." 5.14.21 Hrg. Tr. 178:23-179:2.

February 5th he called to say that—he saw that I resigned. Basically I told him I'm
sorry I didn't tell him that I resigned. He asked where I went, what I was doing. I
said I was working for a commercial ag agency out of the state of California. Just
said that I, you know, had a—I think I was using the term non-compete, but a non-
solicitation agreement at USI, and that I couldn't give him any more details about
anything. That if he wanted any more information, I give [sic] him the option of
calling Trey or Bruce. I don't remember which it was, you know, per what day. But
he said okay. And I gave him the numbers.

Aitkin Dep. 151:3-14. Several former USI clients called Droz or Busch at Alliant
after they spoke with Plaintiff. [2] Many of these former USI clients transferred their
accounts to Alliant, some of whom specifically transferred their business so that they
could eventually work with Plaintiff again.[3] Between February 8, 2021, and September

---

[2] Former clients of Plaintiff at USI provided the following deposition testimony:

> "We had some pleasantries, and he helped direct me to a new insurance agent, provider,
> whatever, and we signed off after a brief discussion." Dates Decl. Def. Mot. Ex. 18
> ("Otness Dep.") 27:21-24, ECF 122-18.

> "[Plaintiff] wouldn't answer of my questions. . . . So he gave me that name if I had
> specific questions to ask to call that person. And so I did, I called Bruce, didn't know
> him, didn't know anything, but it wasn't much help in talking with him." Dates Decl.
> Def. Mot. Ex. 19 ("Burke Dep.") 19:6-19, ECF 122-19.

> "[B]ecause when I tried to call my broker, somebody else answered his phone and I don't
> know who this is, so I called him on his personal cell phone. And that's how I found
> out—well I didn't find out much, because . . . [h]e said he couldn't say much at that
> time." Dates Decl. Def. Mot. Ex. 23 ("McCauley Dep.") 10:20-25, ECF 122-23.

> "He told me he was no longer with USI, and he couldn't help me, and I need to call USI.
> And then I asked him where he was going. He said he was going to Alliant. And I said,
> well, that was frustrating. I asked him if he had Alliant's number and I could reach out to
> them. He said yes. He gave me Alliant's number." Dates Decl. Ex. 26 ("Marcott Dep.")
> 12:15-21.

[3] Several clients gave deposition statements saying they transferred their business from USI to
Alliant specifically to work with Plaintiff:

> "And when I considered whether to stay with USI or the new insurance company, I
> specifically convinced myself to be loyal to [Plaintiff] to make the move." Otness Dep.
> 35:20-22.

23, 2021, fourteen of Plaintiff's former USI clients transferred their business to Alliant. Dates Decl. Def. Mot. Ex. 30 at 6-9, ECF 122-30.[4] Plaintiff did not solicit or directly receive the "broker of record" letters from these clients that officially made Alliant their insurance broker. Wood Decl. Counterclaim Def. Mot. Ex. 11 ("Gesser Dep.) 60: 4-20, ECF 118-11. But thirteen of the fourteen former Aitkin clients are now being serviced by Tilleman or Anderson, Plaintiff's former USI colleagues. Dates Decl. Def. Mot. Ex. 30 at 6-9. None of the clients who transferred their business from USI to Alliant during this time reported that Plaintiff or Alliant had contacted them first or that Plaintiff participated in transferring their business to Alliant. Gesser Dep. 59:7-60:20.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

---

"[B]ut if I wanted to stick with them, [Plaintiff] was going to be working with Alliant, is the right name, I believe, then I could do these letters to switch over and then I'd be able to keep Mike as my broker." McCauley Dep. 22:7-11."

"He said that he was—had resigned from USI and they were going with Alliant. And I said to him, well then, we're—we, as Pomeroy Grain Growers, are going to stick with [Plaintiff]. So if Alliant is a good enough company for you, then it's good enough for us." Dates Decl. Ex. 25 ("Teal Dep.") 12:1-5, ECF 122-25.

[4] In total, forty agricultural insurance clients that had been serviced by Plaintiff, Tilleman, or Anderson, transferred their business to Alliant between February 5, 2021, and October 21, 2021. Dates Decl. Def. Mot. Ex. 30 at 6-14.

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v.
Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108,

1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be

drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of
Bricklayers & Allied Craftsman Loc. Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d

1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what

inferences should be drawn from them, summary judgment is improper.").

**DISCUSSION**

In his sole claim for relief, Plaintiff seeks a declaratory judgment stating that the Restrictive Covenants in his Employment Agreement are unenforceable. Am. Compl. ¶ 18, ECF 33. Defendants bring six counterclaims against Plaintiff and Counterclaim Defendant Alliant: (1) a renewed claim for injunctive relief against Plaintiff; (2) a breach of contract claim against Plaintiff; (3) a breach of fiduciary duties claim against Plaintiff; (4) a claim for injunctive relief against Alliant; (5) a claim for intentional interference with economic relations against Alliant; and (6) a claim for aiding and abetting breach of fiduciary duties against Alliant. Def. Second Am. Answer ("Answer") ¶¶ 91-152, ECF 95.

Defendants move for partial summary judgment on three claims: (1) Plaintiff's claim for declaratory judgment; (2) Defendants' breach of contract counterclaim; and (3) Defendants' counterclaim that Alliance intentionally interfered with their contractual relationships and prospective business relationships. Plaintiff and Alliant move for summary judgment on all of Defendants' counterclaims.

## I.     Plaintiff's Claim for Declaratory Relief

Defendants move for summary judgment on Plaintiff's claim that the Restrictive Covenants in his Employment Agreement with USI are void and unenforceable. In granting Defendants' motion for a preliminary injunction, this Court preliminarily found that the Restrictive Covenants are enforceable, subject to an 18-month statutory limitation. *See Aitkin*, 2021 WL 2179254, at *4-6. The Court determined that the relevant provisions were broad enough to effectively constitute a noncompetition agreement, which must comply with certain restrictions under Oregon law. But the Court held that, even as a noncompetition agreement, the Restrictive Covenants are enforceable because they comply with the requirements for restraints

on trade under both Oregon Revised Statute § ("O.R.S.") 653.295 and Oregon common law. In moving for summary judgment, Defendants urge the Court to adopt its prior preliminary holding. In his claim for declaratory relief, Plaintiff asserts that the Restrictive Covenants are unenforceable under Oregon common law because they are overbroad and unreasonable. Specifically, Plaintiff argues that Defendants have no legitimate business interest in barring Plaintiff from accepting and servicing business from his former clients who seek him out when he does not solicit their business.

Under Oregon law, a "noncompetition agreement" is defined as "an agreement . . . between an employer and employee under which the employee agrees . . . either alone or as an employee of another person . . . [to] not compete with the employer in providing products, process or services that are similar to the employer's products, processes or services for a period of time or within a specified geographic area after termination of employment." O.R.S. 653.295(d). In 2007, the Oregon legislature evinced an interest and concern for the freedom of movement of employees and "dramatically limited the enforceability of noncompetition agreements." *Phoseon Tech., Inc. v. Heathcote*, No. 3:19-cv-2018-SI, 2019 WL 7282497, at *11 (D. Or. Dec. 27, 2019). Among other imposed restrictions, Oregon law limits the term of a noncompetition agreement to eighteen months and makes a noncompetition agreement voidable unless the employer has a "protectable interest" and the employee received written notice of the noncompetition provisions at least two weeks before the first day of their employment. O.R.S. 653.295(1)-(2).

Generally, contracts that restrain a former employee from soliciting customers for business purposes are not subject to the statutory requirements for noncompetition agreements. *See* O.R.S. 653.295(4)(b) (exempting "covenant[s] not to . . . solicit or transact business with

customers of the employer" from the requirements for noncompetition agreements). But Oregon courts have construed the term "competition" broadly and have held that certain "nonsolicitation provisions can be considered noncompetition agreements under [O.R.S. 653.295]" *Moreland v. World Commc'n Ctr., Inc.*, No. Civ. 09-913-AC, 2010 WL 4237302, at *3 (D. Or. Sept. 17, 2010) (citing *Dymock v. Norwest Safety Protective Equip. for Or. Indus., Inc.*, 172 Or. App. 399, 404, 19 P.3d 934, 937 (2001), *rev'd on other grounds*, 334 Or. 55, 45 P.3d 114 (2002)). And this Court has held that an employment agreement which "seek[s] to restrain [an employee's] ability to solicit former customers" meets the definition of a noncompetition agreement under O.R.S. 653.295. *First Allmerica Fin. Life Ins. Co. v. Sumner*, 212 F. Supp. 2d 1235, 1239 (D. Or. 2002). A non-solicitation agreement need not preclude a former employee from engaging in the same business as the employer to be considered a noncompetition agreement, so long as it "materially deter[s] or impair[s] the employee from doing so." *Dymock*, 172 Or. App. at 404.

The Restrictive Covenants here are even broader than merely covenants not to solicit or transact business with former clients. Section 8.5 of the Employment Agreement also prohibits Plaintiff from "divert[ing] or attempt[ing] to divert services" related to any client or active prospective client accounts away from Defendants and from "induc[ing] the cancellation, termination, or non-renewal of any client account." An employment agreement that prohibits a former employee from inducing insurance policy holders to terminate or replace policies issued by the employer "falls squarely within the definition of a noncompetition agreement." *First Allmerica,* F. Supp. 2d at 1238. Even more broadly, Section 8.6 prohibits Plaintiff from "provid[ing] or accept[ing] any request to provide services" to any of his former clients. These provisions materially deter Plaintiff from competing with Defendant on behalf of his new employer. Thus, "[b]ecause the overall effect of Sections 8.5 and 8.6 of the Agreement is to

prevent Plaintiff from competing with Defendants, the Court construes the Restrictive Covenants as a noncompetition agreement that must comply with both O.R.S. 653.295 and common law." *Aitkin*, 2021 WL 2179254, at *4 (quoting *Naegel Reporting Corp. v. Peterson*, No. 3:11-1138-HA, 2011 WL 11785484, at *3 (D. Or. Dec. 5, 2011)) (brackets and internal quotation marks omitted); *see Brinton Bus Ventures, Inc. v. Searle*, 248 F. Supp. 3d 1029, 1032 (D. Or. 2017) ("To be enforceable under Oregon law, a covenant not to compete must meet both the requirements of [] O.R.S. 653.295 and Oregon's common law governing restraints on trade.").

### A.    O.R.S. 653.295 Requirements

Oregon statute requires that a noncompetition agreement between an employer and employee be "voidable" unless "the employer informs the employee in a written employment offer received by the employee at least two weeks before the first day of the employee's employment that a noncompetition agreement is required as a condition of employment." O.R.S. 653.295(1)(a)(A). The uncontroverted facts show that Plaintiff received a draft copy of the Employment Agreement on or before April 19, 2018, and his employment with Defendants began on May 4, 2018. Thus, because Plaintiff received written notice of the Restrictive Covenants more than two weeks before he started working for Defendants, "the noncompetition provisions are not voidable for lack of sufficient notice." *Aitkin*, 2021 WL 2179254, at *4.

Under O.R.S. 653.295(2), "a noncompetition agreement  may not exceed 18 months from the date of the of termination of the employee's employment." Both the non-solicitation provisions of Section 8.5(a) and the non-acceptance/non-service provisions of Section 8.6(a) extend to two years after a producer's employment with Defendants has terminated. Although these provisions violate the durational limitation under the statute, they are enforceable to the extent that they comply. "The *remainder* of a term of a noncompetition agreement in excess of

18 months is voidable and may not be enforced by a court of this state." O.R.S. 653.295(2) (emphasis added); *see* Agreement § 8.10 ("If a court finds any covenants in this Agreement exceed the permissible time or scope limitations, such covenants shall be reformed to the maximum permissible time or scope limitations."). Thus, the Court adopts its previous holding that the Employment Agreement is enforceable under O.R.S. 653.295, but only to the extent that it prohibits Plaintiff from competing with Defendants for a period of eighteen months. *See Aitkin*, 2021 WL 2179254, at *5.

### B.    Common Law Requirements

Defendants urge the Court to adopt its previous finding that the Restrictive Covenants in the Employment Agreement are enforceable under Oregon common law. Plaintiff renews his argument that the Restrictive Covenants do not satisfy the "reasonableness" requirement. Specifically, Plaintiff asserts the provisions that prevent him from accepting or servicing business from his former USI clients, even when he does not solicit their business, are unreasonable.

> To be enforceable, a covenant not to compete must meet three requirements:
>
> (1) it must be partial or restricted in its operation in respect either to time or place; (2) it must be on some good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public.

*Nike, Inc. v. McCarthy*, 379 F.3d 576, 584 (9th Cir. 2004) (quoting *Eldridge v. Johnson*, 195 Or. 379, 403, 245 P.2d 239, 250 (1952). Neither Defendants nor Plaintiff objects to the Court's prior finding that the first two elements are satisfied. The Employment Agreement is restricted with respect to time because, as the Court held, it is only enforceable up to the 18-month statutory

limitation. And the Agreement was made on "good consideration" because Plaintiff received employment and a salary in exchange for agreeing to abide by the provisions of the Agreement.

As to the third element, "[t]o satisfy the reasonableness requirement, the employer must show as a predicate that it has a legitimate interest entitled to protection." *Id.* at 584-85 (quoting *N. Pac. Lumber Co. v. Moore*, 275 Or. 359, 364, 551 P.3d 431, 434 (1976)). An employer does not have a legitimate protectable interest in an employee's general skills or industry knowledge, even if they were acquired while working for the employer. *Id.* at 585. On the other hand, an employer does have a protectable interest in the "information pertaining especially to the employer's business." *Id.* (citation omitted). An employer's interest need not be a trade secret or other confidential information; it may simply be customer contacts. *See Kelite Prod., Inc. v. Brandt et al.*, 206 Or. 636, 656, 294 P.2d 320 (1956) ("[I]f the nature of the employment . . . enabl[es] him, by engaging in a competing business in his own behalf, or for another, to take advantage of such . . . acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer[.]"). Contacts between employees and customers "can create a protectable interest when the nature of the contact is such that there is a substantial risk that the employee may be able to divert all or part of the customer's business." *Actuant Corp. v. Huffman*, No. CV-04-998-HU, 2005 WL 396610, at *6 (D. Or. Feb. 18, 2005) (quoting *Volt Servs. Grp., Div. of Volt Mgmt. Corp. v. Adecco Emp. Servs.*, 178 Or. App. 121, 126-27, 35 P.3d 329, 334 (2001)).

In opposing summary judgment, Plaintiff argues that the Restrictive Covenants are unreasonable to the extent that they prohibit him from accepting clients who voluntarily request his services. Plaintiff claims that Defendants have no legitimate interest in business relationships with these clients because they have already decided to sever their ties with Defendants. Relying

on *Getman v. USI Holdings Corp.*, Plaintiff contends that, in the insurance business, most of the goodwill developed with clients belongs to the employee-agent because the employer-broker does not actually produce the insurance policies and relies primarily on agents to service its clients' needs. No. 05-3286-BLS2, 2005 WL 2183159, at *3 (Mass. Super. Ct. Sept. 1, 2005) (noting that an insurance agent is "primarily responsible for selecting the best policy, working with the client to file claims, and following up with renewals"). In *Getman*, the court determined that the employer is entitled to preserve its own goodwill but not "the good will earned by the employee that fairly belongs to the employee." *Id.* But the court also recognized that "the company's good will and the employee's good will are inevitably intertwined." *Id.*

In *Getman,* the employment contract included a covenant that barred the employee "for three years from, 'directly or indirectly,' soliciting or accepting insurance business from any [of the defendant's] client[s]." *Id.* at *1. The court determined that the non-solicitation agreement was enforceable, but "only to the extent that it strikes a fair balance between protecting [the employer's] confidential information and the good will it has earned as a company vs. taking the good will earned by and belonging to [the employee] individually." *Id.* at *3; *see Sentry Ins. v. Firnstein*, 14 Mass. App. Ct. 706, 708, 442 N.E.2d 46, 47 (1982) ("The objective of a reasonable noncompetition clause is to protect the employer's good will, not to appropriate the good will of the employee."). In striking that "fair balance," the court in *Getman* noted that the non-solicitation clause should not "bar [the employee] from accepting insurance business from his former [employer's] clients if, without his solicitation of their business, they wish him to continue . . . to service their insurance needs." *Id.* Based solely on the reasoning in *Getman*, Plaintiff's argument that the non-accept and non-service provisions of the Agreement are unreasonable may hold merit.

But the Oregon Supreme Court has rejected the notion, as stated by the Massachusetts court in *Getman*, that the goodwill established by an employee belongs primarily to the employee and not the employer. In *Kelite Productions, Inc.*, the Oregon Supreme Court noted that an "employer, who pays [their employees] a salary for this purpose, is entitled to the good will which they so establish, and to be protected therein insofar as it may be reasonably necessary to [the employer's] interests." 206 Or. at 652; *see Cascade Exch., Inc. v. Reed*, 278 Or. 749, 751, 565 P.2d 1095, 1096 (1977) (per curiam) (holding that an employer had a "protectible interest" justifying enforcement of noncompetition agreements against former employees who generated goodwill based on "frequent and close contacts with [the employer's] customers on a personal basis").

Thus, Plaintiff's argument that Defendants have no protectable interest in the personal goodwill he developed with his clients fails under Oregon law. Defendants have a sufficient protectable interest in their established business relationship with Plaintiff's former clients that justifies prohibiting Plaintiff from accepting or servicing the business of those clients. The restrictions are not overly broad. They do not prohibit Plaintiff from competing with Defendants for new clients on behalf of his new employer. *See Konecranes, Inc. v. Sinclair*, 340 F. Supp. 2d 1126, 1131 (D. Or. 2004) ("In deciding whether a non-compete agreement is reasonable, an important consideration is whether it merely restricts away specific accounts . . . or whether it restricts the employee from competing at all."). They do not prevent Alliant, Plaintiff's new employer, from accepting or servicing his former USI clients through other brokers. And by statute, the restrictions are limited in time, so that Plaintiff may solicit, accept, service any of his former USI clients after eighteen months. All of the provisions of the Restrictive Covenants protect employer-interests that Oregon courts have held to be legally cognizable. *See Ocean*

*Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, 648 F. App'x 709, 711 (9th Cir.

2016) (citing *Nike, Inc.*, 379 F.3d at 586) (explaining that the proprietary information acquired

by virtue of prior employment creates a "substantial risk" that a former employee could "divert

all or part of the employer's business" even without directly soliciting the employer's

customers).

Accordingly, the Restrictive Covenants are enforceable in their entirety, including the

provisions barring Plaintiff from accepting his former clients who seek his services on their own

initiative. The Court grants summary judgment for Defendants on Plaintiff's claim for a

declaratory judgment that the Restrictive Covenants are void and unenforceable. But the Court

again holds that the Restrictive Covenants are only enforceable within the 18-month statutory

limitation.

## II.  **Defendants' Counterclaim for Breach of Contract**

### A.    **Defendants' Motion for Summary Judgment**

Defendants assert that they are entitled to summary judgment on their counterclaim for

breach of contract. Defendants allege Plaintiff breached his Employment Agreement by directly

or indirectly attempting to solicit or divert Defendants' clients to Alliant.[5] To be entitled to

summary judgment on their breach of contract claim, Defendants must show that undisputed

material facts establish (1) the existence of a contract and its relevant terms; (2) that Defendants

fully performed and did not breach the contract; and (3) that Plaintiff breached the contract,

resulting in damages to Defendants. *Schmelzer v. Wells Fargo Home Mortg.*, No. CV-10-1445-

---

[5] In their Answer to Plaintiff's Amended Complaint, Defendants assert that Plaintiff breached the "garden leave" provision of the Employment Agreement by failing to provide 60-days notice prior to terminating his employment. Answer ¶ 104. But in their Motion for Partial Summary Judgment, Defendants do not argue for summary judgment on this portion of their breach of contract counterclaim.

HZ, 2011 WL 5873058, at *4 (D. Or. Nov. 21, 2011) (citing *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570-71, 927 P.2d 1098, 1101 (1996)). As to the first element, there is no question that the Plaintiff signed the Employment Agreement, and as the Court has held, the Agreement is an enforceable contract under Oregon law. Regarding the second element, Plaintiff does not allege that Defendants violated the Employment Agreement on their end or failed to perform on the contract in any way. Therefore, the question for the Court is whether undisputed facts establish that Plaintiff breached the Employment Agreement.

The Restrictive Covenants in the Employment Agreement provide that for a period of two years, Plaintiff shall not, "directly or indirectly," on behalf of a competitor "in any capacity" (1) "solicit or attempt to solicit," (2) "divert or attempt to divert," or (3) "sell, provide, or accept any request to provide services in competition" with Defendants as to any of Defendants' active clients that Plaintiff serviced or obtained confidential information about within two years of his resignation. Agreement §§ 8.5(a), 8.6(a).[6] The Restrictive Covenants prohibit the same activity for period of six months as to any "Active Prospective Clients" that Plaintiff solicited or obtained confidential information about in the six months prior to his resignation. Agreement §§ 8.5(b), 8.6(b). Additionally, Plaintiff may not "induce the termination, cancellation or non-renewal" of Defendants' active clients. *Id.* § 8.5(a)(v).

Defendants argue that by receiving calls from his former clients and referring them to his new colleagues as Alliant, Plaintiff violated Section 8.5(a)(ii) of the Employment Agreement. Section 8.5(a)(ii) prohibits directly or indirectly "divert[ing] or attempt[ing] to divert services away" from USI. Defendants concede that they have no evidence that Plaintiff initiated contact

---

[6] As noted above, these restrictions in the Agreement are only enforceable for a term of eighteen months.

with any of his former clients after his resignation from USI. Defendants also do not dispute that

when his former clients contacted him, Plaintiff refused to talk to those clients about anything

related to their business with USI. But at the end of these calls, Plaintiff provided the name and

phone number of one of his new colleagues at Alliant.[7] Defendants argue that Plaintiff's action in

"referring" clients to Alliant constituted indirect solicitation, diversion, or inducement of his

former USI clients to transfer their business to his new employer because he "pass[ed] the baton

to his new Alliant colleagues, whom [Plaintiff] knew would solicit them." Def. Mot. 27,

ECF 123. Defendants also claim that by referring these clients to Alliant, Plaintiff indirectly

accepted and serviced their business on behalf of his new employer, even though Alliant had

other employees facilitate the transfer of their business. According to Defendants, Plaintiff

indirectly accepted his former USI clients' business because he knew his Alliant colleagues

would complete the paperwork to transfer these clients' accounts.

 In making these arguments, Defendants rely on a federal district court's holding in

*Anderson v. USI Advantage Corp.*, No. 19-CV-05582-SCJ, 2020 WL 1933803

(N.D. Ga. Apr. 21, 2020). In that case, the court held that former employees of an insurance

brokerage firm solicited their former clients' business by referring those clients to specific

contacts at their new employer. *Id.* at *4-5. But unlike here, in *Anderson*, the employees initiated

contact with their former clients by sending mass emails followed by ongoing communications

---

[7] The parties dispute whether Plaintiff provided all of his former USI clients with the contact information of his new Alliant colleagues. Plaintiff testified that he only provided the names and phone numbers of Bruce Droz and Trey Busch to those clients who asked for more information. Therefore, whether Plaintiff gave *every* former client with whom he spoke the contact information for Alliant representatives is a disputed fact. Among the twenty-three clients who contacted Plaintiff, fourteen transferred their business to Alliant after speaking with Droz or Busch.

through phone calls, text messages, and LinkedIn. *Id.* at *3. Defendants do not allege that Plaintiff actively contacted any of his former USI clients.

Nevertheless, a former employee can violate a non-solicitation clause even when that employee does not initiate contact with former clients. *See Morgan Stanley Smith Barney LLC v. Sevcik*, No. 1:21-cv-001120-AA, 2021 WL 3465922, at *6 (D. Or. Aug. 6, 2021) (holding that a former employee "bringing up the subject" of transferring account with former clients who initiated contact raised "serious questions" about whether non-solicitation provisions have been breached). A former employee may violate a non-solicitation clause by indirectly soliciting their former clients and having other colleagues service these clients as proxies. *Millenium Health, LLC v. Barba*, No. 3:21-cv-02035-HZ, 2021 WL 1254349, at *5 (D. Or. April 5, 2021). The "temporal proximity between the communications" made by a former employee and the transfer of employment can strongly suggest that the employee violated provisions barring soliciting or inducing movement of other employees. *Movement Mortg., LLC v. Ward*, No 3:14-cv-23-RJC-DCK, 2014 WL 880748, at *2 (W.D.N.C. Mar. 6, 2014).

But "indirect solicitation requires affirmative action from employees to bring clients to their new employer." *USI Ins. Servs. LLC v. Craig*, No. 18-CV-79-F, 2019 WL 5295533, at *7 (D. Wyo. Apr. 9, 2019). "[M]erely informing customers of a change in employment does not constitute solicitation. Likewise, a willingness to discuss business upon invitation of another party does not constitute solicitation." *Id.* (internal quotation marks and citation omitted). In addition, some courts have declined to endorse "the use of purely circumstantial evidence of indirect solicitation as dispositive grounds for breach of contract." *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *16 (N.D. Ohio Aug. 30, 2016).

The court in *Getman* explained the distinction between a departing employee providing the common courtesy of informing their clients of their departure and the employee soliciting his former clients to transfer their business to their new employer. 2005 WL 2183159, at *4.

> Nor, if a former client initiates contact with the insurance agent, is it solicitation for the agent to explain in summary terms why he left his former employment and joined his current employer. Nor is it solicitation to describe in general terms the type of work that he will do in his new job and the nature of the work performed by his new company. Such a discussion, however, whether oral or in writing, may potentially constitute solicitation if the insurance agent, not the client, were to initiate this discussion. Moreover, even if the client initiates the discussion, it may be solicitation for the insurance agent to deprecate his former employer so as to diminish the good will it would otherwise enjoy, or praise his new employer or otherwise encourage the client to bring his business there.

*Id.* The court found that even though Mr. Getman initiated communication with his former clients, he did not engage in solicitation in violation of his employment agreement. *Id.*

Here, Defendants present evidence that Plaintiff referred clients who called him to his new Alliant colleagues and provided their contact information. But there is no other evidence that Plaintiff said anything during the calls with his former clients, that could constitute attempts to solicit, divert, or accept business from them. Defendants have no evidence that Plaintiff disparaged USI or praised Alliant. Defendants also provide no direct evidence that Plaintiff asked or encouraged his former clients to leave USI or transfer their accounts to Alliant. Nor do Defendants show that Plaintiff told any clients that he would continue to be their broker. USI executive Chris Brisbee testified that none of Plaintiff's former clients with whom he communicated said that Plaintiff had solicited their business or serviced their business on behalf of Alliant. Brisbee Dep. 65:18-67. To the contrary, several clients stated that Plaintiff would not provide them any details about his departure from USI or his new employment.

Defendants provide circumstantial evidence and present a theory of Plaintiff's involvement in a "masterplan" in collusion with Alliant to poach their clients. Defendants point

to Plaintiff's "abrupt" departure from USI and immediate change to his LinkedIn profile
advertising that he worked for Alliant to show that Plaintiff induced his former clients to call
him. But by contacting several of Plaintiff's clients themselves and telling them that Plaintiff had
abruptly departed, Defendants themselves caused many of Plaintiff's former clients to contact
him seeking information. Although one client testified that Lee Tilleman, Plaintiff's colleague
who also left USI for Alliant, contacted him and told him to call Plaintiff, Defendants do not
show that Plaintiff directed or was even of aware of Tilleman's action. Thus, Defendants present
no undisputed facts which support their allegation that Plaintiff, in collaboration with his new
employer, executed an elaborate ploy to entice his former clients to contact him after his
resignation.

   Defendants ask the Court to make inferences in their favor as to their circumstantial
evidence. But the Court must draw inferences from the facts in the light most favorable to
Plaintiff as the non-moving party. Unresolved questions of material fact exist as to whether
Plaintiff's affirmative acts amounted to indirect solicitation of his former clients' business or
indirect diversion of services as to those clients away from Defendants in violation of Section
8.5. Likewise, no undisputed facts definitively show that Plaintiff accepted requests to provide
services to his former clients in violation of Section 8.6. Whether Plaintiff telling his former
clients to call his new colleagues constitutes a breach of his Employment Agreement with
Defendants will be for a jury to decide. Making inferences in the light most favorable to
Plaintiff, the Court denies summary judgment for Defendants on their counterclaim for breach
of contract.

B.       **Plaintiff's Motion for Summary Judgment**

Plaintiff also moves for summary judgment on Defendants' breach of contract counterclaim. Plaintiff makes two arguments. First, Plaintiff asserts that Defendants present no evidence to support their claim that Plaintiff breached his Employment Agreement by "disclosing or relying on confidential information that he obtained while working at USI for the benefit of Alliant." Answer ¶ 106. Second, Plaintiff argues that Defendants provide no facts showing that Plaintiff accepted or serviced the business of Defendants' clients.

As for Plaintiff's alleged use of confidential information, Defendants show that on September 29, 2020, after he had begun discussions about employment with Alliant, Plaintiff emailed a spreadsheet from his authorized USI email to his personal email account. The spreadsheet contained Defendants' confidential information about Plaintiff's client accounts, including the specific types of coverage each client has and the amounts paid for such coverage. The spreadsheet also included the policy numbers for every insurance policy associated with each client and the renewal date for each policy.

Plaintiff is correct that Defendants provide no direct evidence that Plaintiff has disclosed or misused any of the confidential information contained in the spreadsheet. But as the Ninth Circuit has explained, the risk that an employee could use proprietary information he acquired as an employee to divert all or part of the employer's business "goes beyond direct solicitation of customers and explicit disclosure of confidential information." *Ocean Beauty Seafoods,* 648 F. App'x at 711. And Courts have held that employees may breach confidentiality obligations simply by emailing confidential documents to themselves prior to resigning. *See A Place for Mom v. Perkins*, 475 F. Supp. 3d 1217, 1227 (W.D. Wash. 2020); *Getman*, 2005 WL 2183159, at *5 (finding that an employee breached his confidentiality obligation by "emailing to his

personal computer and retaining a list of his former clients."). Defendants have not shown that Plaintiff retained the spreadsheet or forwarded it to his new employer. But based on the circumstances and the timing of Plaintiff's email to himself, a jury could reasonably infer that he misappropriated Defendants' confidential information.

Plaintiff next argues he is entitled to summary judgment because Defendants have no evidence that he accepted or serviced business from his former clients. Defendants do not show any direct communications between Plaintiff and his former clients in which Plaintiff accepted their business. But a jury could infer from circumstantial evidence that Plaintiff breached the Restrictive Covenants in his Employment Agreement. Plaintiff accepted calls from several of his former clients. To these clients, he provided the names and phone numbers of representatives of his new employer, Alliant. Fourteen of Plaintiff's former USI clients spoke with Alliant employees who facilitated the transfer of each of these clients' accounts away from Defendants and to Alliant. Some clients stated specifically that they transferred their business in anticipation of, at some point, being able to work with Plaintiff again. Thus, the Court finds that questions of fact exist as to whether Plaintiff indirectly solicited, diverted, or accepted business from his former clients on behalf of Alliant. Viewing the facts and making inferences in the light most favorable to Defendants, the Court denies summary judgment for Plaintiff on Defendants' breach of contract counterclaim.

## III.    Intentional Interference with Economic Relations

### A.    Defendants' Motion for Summary Judgment

Defendants fifth counterclaim asserts that Alliant tortiously interfered (1) with their contractual employment relationship with Plaintiff and (2) with their prospective business relationships with clients. Defendants move for summary judgment on this counterclaim.

A claim for intentional interference with economic relations ("IIER") requires proof of six elements: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841, 844 (1995). IIER claims serve as "means of protecting contracting parties against interference in their contracts from *outside* parties." *Id.* at 536 (emphasis in original). In other words, when a party breaches a contract, an IIER claim allows the non-breaching party "to seek damages from a third party that induced the [breaching] party to breach the contract." *Id.*

Defendants first allege that Alliant hired Plaintiff and directed him to resign "effective immediately" from USI in violation of the garden leave provision of the Employment Agreement. Defendants allege that Alliant was aware of Plaintiff's 60-day notice of termination requirement, which they induced him to violate. Defendants also claim that, as part of a "masterplan," Alliant poached Plaintiff and two other producers in order to steal those producers' clients from Defendants. As to both Plaintiff's employment contract and Defendant's business relations, undisputed facts establish five of the six elements needed to prove IIER. As a third party to USI's contracts, Alliant intentionally hired Plaintiff away from Defendants and accepted/serviced several of Plaintiff's former clients who had existing business relationships with Defendants, resulting in damages to Defendants in the form of losing a valuable employee as well as several clients. Thus, the only remaining issue is whether Alliant interfered using improper means or for an improper purpose.

Defendants have the burden of showing that Alliant interfered "for an improper purpose rather than a legitimate one." *Straube v. Larson*, 287 Or. 357, 361, 600 P.2d 371, 374 (1979).

In analyzing "improper purpose" under Oregon law, business competitors may be entitled to a "business competitor's privilege" if they acted to further their own legitimate business interests. *Insight Glob., LLC v. Tesar*, No. 3:18-cv-00368-YY, 2019 WL 2488717, at *3 (D. Or. Mar. 20, 2019). A business that intentionally induces disruption of a competitor's contract with an employee or a client does not do so improperly if "(a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint on trade and (d) his purpose is *at least in part to advance his interest in competing with the other*." *Douglas Med. Ctr., LLC v. Mercy Med. Ctr.,* 203 Or App. 619, 631, 125 P.3d 1281, 1287 (2006) (quoting Restatement (Second) of Torts § 768(1)) (emphasis added). Oregon courts have held that a business is entitled to the business competitor's privilege under the Restatement § 768, even if that business hires a competitor's employee and uses contacts and information gained by that employee during their prior employment to divert business away from the competitor. *Insight Global,* 2019 WL 2488717, at *5 (citing *N. Pac. Lumber Co.*, 275 Or. at 371). However, "the competitor's privilege does not shield a company from liability for tortious interference when the employee is bound by a covenant not to compete." *Id.* at *3. "Although a business is permitted to hire talented employees from a competitor for the legitimate purpose of benefiting its own business," it may be liable for tortious interference if it knows the employees are contractually bound yet encourages the employees to breach their contracts. *Id.*

"Improper means" must be some independently wrongful act such as "violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Conklin v. Karban Rock, Inc*., 94 Or. App. 593, 601, 767 P.2d 444, 448 (1989). Defendants can establish that Alliant used improper means "by showing a violation of a

statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Volt Servs. Grp.,* 178 Or. App. at 129 (internal quotation marks and citation omitted).

Defendants contend that Alliant orchestrated a "master plan" to poach USI's producers along with those producers' clients in violation of the restrictive covenants in the producers' employment contracts. Alliant was aware of the garden leave provision in Plaintiff's Employment Agreement with Defendants, and Plaintiff clearly breached that provision by failing to give 60-days' notice before resigning. But Defendants provide no evidence that Alliant directed Plaintiff to resign abruptly or otherwise encouraged him to do so. Alliant simply provided a start date for Plaintiff's new employment, which is not in itself evidence that Alliant caused Plaintiff to give inadequate notice to his former employer. Defendants rely on circumstantial evidence that three of their employees resigned within 24 hours to join Alliant— which, according to Defendants, indicates that the resignations were coordinated by Alliant. But Plaintiff testified that when he submitted his resignation, he did not know the other two employees had also resigned. Making inferences in the light most favorable to Plaintiff, the Court finds that Defendants do not show that Alliant induced Plaintiff to breach the garden leave provision of his employment contract.

Defendants also fail to present undisputed facts that establish that Alliant used improper means or acted with an improper purpose in accepting and servicing Plaintiff's former clients who initiated contact with Alliant employees. As explained in I.B., *supra*, Defendants have not established that Plaintiff breached the Restrictive Covenants in his Employment Agreement. Similarly, Defendants present no evidence that Alliant violated any statute, regulation, or established standard within the insurance brokerage industry when it accepted the business of

Defendants' former clients. Accordingly, summary judgment for Defendants on their IIER claim is denied.

### B. Alliant's Motion for Summary Judgment

In moving for partial summary judgment on count one of Defendants' IIER counterclaim, Alliant argues that Defendants lack evidence that Plaintiff violated the "no-accept and no-servicing covenants in his USI employment agreement." Counterdef. Mot. 1, ECF 117. Alliant argues that it is entitled to summary judgment on this claim, because the provisions prohibiting Plaintiff from accepting or servicing unsolicited business are unenforceable. According to Alliant, because Defendants cannot show that Plaintiff breached his contractual obligations, Defendants also cannot show that Alliant interfered to cause the breach. But the Court finds that the Restrictive Covenants in Plaintiff's Employment Agreement, including the no-accept and no service provisions, are enforceable. *See* I.B., *supra*. Therefore, Plaintiff's argument fails to the extent that it asserts that those provisions of the Employment Agreement are unenforceable.

In its opposition to Defendant's motion for summary judgment, Alliant correctly asserts that Defendants have not proven that they are entitled to relief as a matter of law on their IIER counterclaim. It may be reasonable to infer from the evidence that Alliant was pursuing a legitimate business purpose when it accepted and serviced business from Plaintiff's former USI clients. But other conclusions may also reasonably be drawn from the evidence. Plaintiff suddenly resigned from USI and immediately started working for Alliant. Then, several of Plaintiff's clients called him soon after he resigned. Several of those clients transferred their business to Alliant after Plaintiff gave them the contact information for Alliant employees. Based on those facts, a jury could reasonably infer that Alliant intentionally interfered with Defendants' contract with Plaintiff and with Defendants' business relationships with their clients using

improper means. Accordingly, the Court denies summary judgment for Plaintiff on Defendants'
IIER claim.

## IV.    Defendants' Counterclaims for Breach of Fiduciary Duties

Defendants assert counterclaims alleging that Plaintiff, as an employee of USI, breached
a duty of loyalty he owed to his employer and that Alliant aided and abetted Plaintiff's breach.
Plaintiff and Alliant move for summary judgment on these claims.

### A.    Plaintiff's Breach of the Duty of Loyalty

An employee, as an agent of their employer, owes a duty of loyalty to the principal-
employer. *See Synectic Ventures I, LLC v. EVI Corp.*, 353 Or. 62, 72, 294 P.3d 478, 484 (2012)
(discussing the duty of loyalty in the context of an employee-employer relationship). In
accordance with this principle, "an employee is precluded from actively competing with this
employer during the period of employment." *E\*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 1029,
1032 (D. Ariz. 2018) (internal citations and brackets omitted). But an agent only carries a duty of
loyalty so long as the agency relationship exists, or in the employment context, so long as the
employee remains employed by the company. In other words, an employee's duty of loyalty to
their employer ends upon termination of employment. *See Konecranes, Inc.*, 340 F. Supp. 2d at
1132 (rejecting an employer's contention that an employee's duty of loyalty continues after
termination of employment).

Plaintiff submitted his resignation on February 4, 2021. Defendants argue that because
Plaintiff failed to provide 60-days' notice as required by the Employment Agreement, his
resignation was not effective until April 4, 2021. Defendants claim that Plaintiff breached a duty
of loyalty he owed to USI between February 4, 2021, and April 4, 2021, when he publicly

displayed on his LinkedIn page that he worked for Alliant and directed his former USI clients to call Alliant representatives.

Plaintiff clearly breached the garden leave provision of his Employment Agreement by not providing 60-days' notice. But while an employee has no legal right to breach a garden leave provision, that employee has the *power* to terminate their employment at any time. *Pierce v. Douglas Sch. Dist. No. 4*, 297 Or. 363, 371, 686 P.2d 332, 337 (1984). While an employee may be subject to consequences from breaching their employment contract, the employee "may quit [their] job at any time and may not be compelled specifically to perform an employment contract." *Id.* Thus, Defendants could not compel Plaintiff to remain their employee after he resigned, and his resignation was effective on the date he provided. And Plaintiff only owed Defendants a duty of loyalty until the date and time he effectively resigned. *See Konecranes, Inc.,* 340 F. Supp. 2d at 1132; *see also Aon PLC v. Infinite Equity, Inc.*, No 19 C 7504, 2021 WL 4192072, at *20 (N.D. Ill. Sept. 15, 2021) (noting that although contractual obligations may apply, no post-employment fiduciary duty "prevents an employee from competing with his former employer post-employment").

Accordingly, for Defendants to have a viable claim that Plaintiff breached his duty of loyalty, they must present facts showing Plaintiff's breaching conduct before he resigned on February 4, 2021. Defendants provide no such evidence. Defendants only allegation that Plaintiff engaged in conduct breaching his duty of loyalty is that "on information and belief," Plaintiff participated in and withheld information about "a planned group departure from USI." Answer ¶ 115. But under Oregon law, nothing prevents an employee under contract from seeking other employment. Oregon law generally favors the freedom of employees to choose their where they work. *See Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 3:21-cv-01631-HZ, 2022

WL 72123, at *7 (D. Or. Jan. 3, 2022) (discussing how Oregon law favors employee mobility). Because Defendants present no evidence that Plaintiff engaged in conduct that breached his duty of loyalty while he was employed at USI, the Court grants summary judgment for Plaintiff on this claim.

### B.    Aiding and Abetting Breach of Fiduciary Duties

In their sixth counterclaim, Defendants assert that Alliant "aided and abetted" Plaintiff in breaching his fiduciary duties by asking Plaintiff to disclose confidential information, by orchestrating the departure of three of Defendants' employees, and by orchestrating efforts to use Plaintiff to accept, solicit, and service Defendant's clients. Answer ¶ 145. To establish aiding and abetting, Defendants must show that Alliant is liable for Plaintiff's tortious conduct, i.e., breach of fiduciary duties. A party may be subject to liability for aiding and abetting if that party:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Reynolds v. Schrock*, 341 Or. 338, 345, 142 P.2d 1062, 1066 (2006) (en banc) (quoting Restatement (Second) of Torts § 876).

As stated above, Defendants present no evidence that Plaintiff breached any fiduciary duties owed to Defendants while he was employed at USI. Defendants also do not allege that Alliant owed or breached any fiduciary duties to USI. Nor do Defendants present evidence that Alliant engaged in any activity to induce Plaintiff to breach his duty of loyalty while he was still employed at USI. Specifically, Defendants do not show that Alliant directed Plaintiff to disclose confidential information or to steer clients towards Alliant while he was still a USI employee.

Although Alliant recruited Plaintiff and two other USI employees while they were still at USI, these efforts alone do not constitute encouragement or assistance to those employees to breach fiduciary duties they owed to Defendants. Accordingly, summary judgment for Alliant is granted on Defendants' claim for aiding and abetting breach of fiduciary duties.

**V.     Defendants' Claim for Injunctive Relief Against Plaintiff and Alliant**

Plaintiff and Alliant move for summary judgment on Defendants' claim for injunctive relief. On May 28, 2021, this Court granted in part Defendants' Motion for Preliminary Injunction. *Aitkin*, 2021 WL 2179254, at *8. The Court's Order restrained and enjoined Plaintiff and those in active concert with him for a period of eighteen months from, directly or indirectly, on behalf of Alliant or any other competitor from soliciting or diverting clients and from accepting any request to provide services or any broker of record letter from any client that Plaintiff had regularly serviced while employed with Defendants. *Id*. In granting the preliminary injunction, the Court found the Restrictive Covenants to be enforceable and found that Defendants had met their burdens of proof and persuasion concerning the alleged breach of the covenants. *Id.* But the Court also noted that "[w]hether Defendants' claims for violation of the Restrictive Covenants will ultimately be borne out by more complete discovery and proved to the trier of fact remains to be seen." *Id.*

Defendants assert counterclaims renewing their request for injunctive relief against Plaintiff and seeking to enjoin Alliant from interfering with Plaintiff's continuing obligations under his Employment Agreement. Defendants assert they are entitled to injunctive relief because Plaintiff has breached the Agreement by disclosing confidential information to benefit Alliant and by accepting, soliciting, and servicing former USI client accounts on behalf of

Alliant. Defendants also claim that Alliant has taken the client goodwill that Defendants employed Aitkin to develop and maintain for their benefit.

After completion of discovery, Plaintiff and Alliant move for summary judgment on Defendants' claim for injunctive relief. Plaintiff contends that Defendants lack evidence that Plaintiff used or disclosed any of Defendants' confidential information, accepted or serviced the business of Defendants' clients or prospective clients, or breached his contract in any other way. Plaintiff and Alliant also renew their argument that the no-accept and no-service provisions in the Employment Agreement are unenforceable.

The Court once again finds that the provisions of the Employment Agreement, though effectively constituting a noncompetition agreement, reasonably protect Defendants' legitimate business interest and are enforceable to the extent that they bar Plaintiff from competing with Defendants for his former clients' business for a term no longer than eighteen months. The Court also determines that issues of material fact preclude finding that, as matter of law, Plaintiff did not breach his Employment Agreement and Alliant did not intentionally interfere with Defendants' economic relations. Consequently, whether Defendants are entitled to injunctive relief against Plaintiff and Alliant must be determined by a trier of fact. The Court denies summary judgment for Plaintiff and Alliant on this claim.

**CONCLUSION**

The Court GRANTS in part and DENIES in part Defendants' Motion for Partial Summary Judgment [123]. The Court grants summary judgment for Defendants on Plaintiff's claim for declaratory relief but denies summary judgment on Defendants' counterclaims for breach of contract and intentional interference with economic relations.

The Court GRANTS in part and DENIES in part Plaintiff's and Counterclaim Defendant Alliant's Motion for Partial Summary Judgment [117]. The Court grants summary judgment for Plaintiff on Defendants' counterclaim for breach of fiduciary duties and grants summary judgment for Alliant on Defendant's counterclaim for aiding and abetting breach of fiduciary duties. The Court denies summary judgment for Plaintiff and Alliant on Defendants' remaining counterclaims.

IT IS SO ORDERED.

DATED:_____June 15, 2022_____.

_____
MARCO A. HERNÁNDEZ
United States District Judge